PICKETT v. F. B. STEARNS CO.

SAME v. WILLYS–OVERLAND, Inc., et al.

(Circuit Court of Appeals, Sixth Circuit.
February 2, 1926.)

No. 4456, 4457.

1. **Patents** ⬦⟶328—824,809, claims 1, 2, and 4, for lubricator, held not infringed.

Pickett patent, 824,809, claims 1, 2, and 4, for lubricator, *held* not infringed.

2. **Patents** ⬦⟶165—Patentee is entitled to benefit of any novelty inherent in mechanism disclosed.

Though not specifically claimed, patentee is entitled to benefit of any novelty which is inherent function of mechanism which he discloses.

Appeals from the District Court of the United States for the Northern District of Ohio; D. C. Westenhaver, Judge.

Patent infringement suits by Lester D. Pickett against the F. B. Stearns Company and against Willys-Overland, Inc., and others. Decrees for defendants, and plaintiff appeals. Affirmed.

See, also, 2 F.(2d) 600.

George E. Kirk, of Toledo, Ohio, for appellant.

Wilber Owen, of Toledo, Ohio (Albert Lynn Lawrence and Tolles, Hogsett, Ginn & Morley, all of Cleveland, Ohio, and Owen & Owen, of Toledo, Ohio, on the brief), for appellees.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

DENISON, Circuit Judge. Infringement suits, based on claims 1, 2, and 4 of patent 824,809, issued July 3, 1906, to the plaintiff for a "lubricator." The appellant here was the plaintiff below; the bills were dismissed for lack of infringement.

[1] Claim 2 may be taken as the best definition of what is now claimed to be the patentable novelty. It reads:

"The combination with an internal combustion engine, of a speed-regulating means for the engine, and a lubricator connected to the speed-regulating means and adjustable therewith, to increase the quantity of lubricant fed at each stroke of the piston as the speed of the engine increases, and to reduce the quantity of lubricant fed at each stroke as the speed of the engine decreases."

The patent shows the lubricator as applied to a motorcycle having a single cylinder explosive engine. The alleged infringement consists in the use by defendants of their respective force feed oiling systems in multi-cylindered automobile engines. It is not to be denied that, if a sufficiently broad construction and sufficiently extensive range of equivalents were to be applied, the language of the claims might be read upon the defendants' devices; but the controlling question is whether, even with a reasonably broad construction, the patent should not be limited to the same general type of device and general theory of operation shown in the specification and drawings. We think that it should be, and will briefly state the reasons.

The motorcycle engine, for connection with which the patentee devised his "lubricator," provided oil for the crank shaft bearings and the cylinder walls by the then well known "splash feed"; that is, the immediate supply of oil was carried in the bottom of the crank case—the crank case pool—and was on such a level therein that, as the flywheel revolved, it dipped into the oil and filled the crank-case and connecting open cylinder end with an oil spray. As the oil was gradually consumed, the oil level would lower, and, when it dropped below the flywheel edge, lubrication by the splash feed would stop. The customary practice was to replenish the supply from time to time by putting more in by hand, thus raising the level. Pickett's "lubricator" consisted in adding to this common construction an elevated external oil reservoir, provided with a feed tube which led down into the crank chamber. At the outlet of the reservoir to this tube was a valve, which would permit either more or less oil to flow down the tube under the combined influence of gravity and suction. This valve was opened and closed by a connection to the spark lever. As the spark was advanced, in connection with and in aid of rapidity of explosions and greater speed, this valve would open and supply more oil per second, and (so far as there was effective suction) more oil per piston stroke, and as the spark lever was retarded the valve would be accordingly closed. It was the patentee's general theory that more oil was consumed at high speeds, and that by this device he would automatically maintain the proper oil level in the crank case.

The defendants do not use the splash feed system to supply oil to the cylinder interiors, but they do have a crank case pool, which it is necessary to maintain at a minimum level; they have no device for automatically supplying more oil thereto from the outside. For this purpose they use the old method of occasional replenishment by hand.

They supply the crank shaft (as well as other) bearings by a force feed system, consisting of a pump, a supply tube leading thereto from the crank case pool, and a system of force feed tubing leading from the pump to the various bearings needing oil. The surplus oil not consumed in the crank bearings is thrown into spray, filling the open cylinder ends, and condenses and runs down again into the crank case pool. At one point in this circuit, and immediately in advance of the pump, there is a relief valve, to be mechanically opened. When opened more or less, a corresponding amount of oil will escape from the tube pressure system, as from a by-pass or spillway, and run down into an immediately surrounding reservoir, which may be called the relief valve pool, whence it will overflow, and by gravity run down again into the crank case pool. As the speed of the engine is increased by opening the throttle, and this relief valve is, through suitable connections, correspondingly closed, the pressure beyond the pump thereby increases above what it would be if the valve remained open. Through the increased speed of the pump alone, the amount of oil fed to the bearings per second would correspondingly increase; whether through the valve action the amount per stroke increases is controverted. It does not seem that the action of the relief valve can have material effect on the oil level in the crank case pool; if more oil escaped through the relief valve, there would be less to go through the bearings, and vice versa; in either case, all the oil which passed through the pump would come back to the crank case pool, one way or the other.

The finding of noninfringement made by the court below was based upon the broad ground that the actual process of lubrication of moving parts by the defendants is begun at the crank case pool, while the patented device relates solely to means for automatically supplying the oil from the outside to this pool; in other words, "defendants begin where plaintiff leaves off." Appellant points out, as he thinks, the defect in this view, by saying that the purpose of his invention is met in material part by supplying the oil spray to the cylinder interiors, the manner of lubricating the bearings being relatively secondary, and that it is not important whether the reservoir from which the lubricant supply is maintained is inside or outside of the engine. He then finds in defendants' crank case pool, or relief valve pool, or in both, the equivalent of plaintiff's external oil cup, and in the functioning of the relief valve the equivalent of plaintiff's automatically controlled reservoir exit valve; he also says that the "speed-regulating means" of his claims may as well be the gas throttle as the spark lever. There is no occasion to consider this last-claimed equivalency; for we think the "lubricator" of the patent claims fairly refers to a device for supplying to the crank case pool new and additional oil, and does not fairly extend to or cover a device for regulating the speed or volume of an interior continuous circulation of the same oil. We conclude that to give the claims such a broad construction would be to yield to the ambiguous effect of some far-reaching, but to that extent inappropriate, words which were used to identify the invention, and to do so at the expense of its real spirit and substance; but the ingenuity and persistence with which appellant urges his position merit some further discussion.

Of course, it had always been true, with splash feed or force feed, that the amount of oil fed per second to the lubricated parts would increase, somewhat or quite proportionately to the speed;[1] but the amount per stroke would remain relatively constant. It perhaps was true that Pickett, for his motorcycle, on account of excessive temperature and leakage at high speeds, needed therefor more oil per stroke. This seems not substantially true as to defendants' engines; indeed, it is the slow moving piston, working against resistance, which needs more oil per stroke. If, however, we should assume that plaintiff invented this step, an out-of-proportion increase in oil feed—that is, on the higher speed to feed more oil per stroke— and had an appropriate claim, infringement would not be clear, but only shadowy. The theory of defendants must be that, since the pump should have a large margin of safety, its full capacity gives too much oil for low speed (unburdened). Accordingly, for this normal operation, a by-pass or spillway is provided, and only (say) one-quarter of the oil pumped goes past the spillway to the bearings. Then let the speed be doubled. Twice as much oil per second, though the same amount per stroke, will be sucked up by the pump. Seemingly twice as much would go to the bearings, but it does not. Perhaps because of disproportionate back pressure at the small bearing ports and at

---

[1] By speed we mean R. P. M., or the piston (sleeve) strokes per second, not speed over the ground.

the relatively large relief valve opening, the amount of oil per stroke at the bearings is not maintained. In order to maintain it, the relief valve opening must be lessened.

It is clear that the bearings thus get at higher speed more oil per stroke than they would get, except for the closing of this relief valve; it is not clear that they get more absolutely per stroke than they had at the lower speed. There is no apparent reason for thinking that they do. Indeed, if the relief valve were wholly closed, the oil feed would be exactly proportionate to the speed, and give precisely the same amount per stroke at higher speed as at lower (unless for reasons not stated in the record). The tests are not convincing. Some of them show a slight disproportion; others do not. The average of a large number of them is not helpful to plaintiffs' theory. Tests involving such delicate distinctions may be affected in slight, but material, degree by so many variant conditions that, when they do not carry far over the line, they are not convincing.

[2] Appellant then says that, even if the oil feed increase is ultimately proportionate to the speed increase, yet that a new result is reached, common to both plaintiff and defendants, by obtaining an out of proportion oil increase with each stroke while the speed is increasing—during the acceleration period. We are not persuaded that this ingenious theory is within the fair contemplation of the specification or claims. It is not mentioned in the specification nor in the Patent Office proceedings, as distinguished from the permanent per stroke increase; true, though it is not specifically claimed, the patentee should have the benefit of any novelty which is an inherent function of the mechanism which he shows (Goshen Co. v. Bissell Co., 72 F. 67, 74, 75, 19 C. C. A. 13); but we think this now claimed function is not present in the patented apparatus in any substantial degree. If the spark lever were gradually advanced in connection with the increasing speed, there would be no substantial interval between the oil acceleration and the speed acceleration; while if the spark lever were jumped forward, and an interval thus produced, we do not see that any increase in the crank pool level during this very brief period could accomplish anything. Hence we feel that this theory is not persuasive.

We do not overlook that Pickett dropped his new oil upon the top of the flywheel, and perhaps at once increased the body of spray filling the crank case. This only made its tendency to raise the pool level less direct.

The decree must be affirmed.