## BISHOP & BABCOCK MFG. CO. v. WESTERN AUTO SUPPLY CO.

### No. 7828.

Circuit Court of Appeals, Sixth Circuit.

June 28, 1939.

Arthur H. Boettcher, of Chicago, Ill. (Brown, Jackson, Boettcher & Dienner, all of Chicago, Ill., and M. B. & H. H. Johnson, of Cleveland, Ohio, on the brief), for appellant.

George T. Bean, of New York City (Kenyon & Kenyon, and Arthur H. Edgerton, all of New York City, and Richey & Watts, of Cleveland, Ohio, on the brief), for appellee.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

ALLEN, Circuit Judge.

This appeal arises out of an action for infringement of four patents relating to automobile thermostats. The usual defenses of anticipation, invalidity and non-infringement were made. The case was referred to a special master, who found all the claims in suit either invalid or not in-

fringed. The District Court adopted the findings and conclusions of the master and dismissed the bill.

The four patents involved are Palm, 1,696,410, issued December 25, 1928; Zimmerman, 1,590,146, issued June 22, 1926; Levy, 1,763,802, issued June 17, 1930; and Levy, 1,822,863, issued September 8, 1931.

The automobile thermostat is a device for controlling the flow of water in the cooling system of an internal combustion engine, in which the temperature resulting from the combustion of the gasoline in the cylinders ranges from 1800 to 1900 degrees Fahrenheit. In addition to the undesirability of overheating, the deleterious effects of which on the internal combustion engine are well known, over-cooling is also undesirable, as a cold engine does not operate properly. To regulate the temperature in the water-cooled engine, water is circulated through a water jacket surrounding the cylinder block and head and through the radiator, where the water loses much of its heat and passes back again through the cylinder block. It was early recognized that some form of thermostatic device was necessary to control temperature by regulating the flow of water according to the temperature. When the water is cold, the automobile thermostat cuts off circulation until the motor is warmed up, after which it permits circulation of the heated water. The patents in suit disclose four different attempts to solve the problem.

The thermostat is usually located between the cylinder block and the radiator, and consists of a valve and a thermostatic element, which when the temperature increases causes the valve to open and when the temperature decreases, causes the valve to close. The poppet, the sleeve-type, the butterfly, and the double-clack valves are used. The thermostatic element which actuates the valve may be either a bellows or a bi-metallic disc. In the bellows type of thermostat, the bellows contains a volatile liquid which vaporizes and expands when the temperature of the water increases. The expansion or contraction of the bellows correspondingly shuts or opens the valves, thereby regulating the circulation of the water. In the bi-metallic disc, metals having a different coefficient of expansion are assembled. Temperature changes acting on the two pieces of metal cause the disc to warp or bend, imparting mechanical motion to the valve.

The Palm Patent, 1,696,410.

Claims 9 and 10 of this patent are in issue. They read as follows:

"9. A flow control device for automobile engine circulating systems adapted to be interposed in said system between the engine and radiator, said device being adapted to be inserted in a conduit constituting a part of said system and said device being entirely self-contained and comprising a frame provided with an outwardly extending imperforate flange adapted for engagement in said conduit, said frame being arranged substantially coaxially of said conduit in line with the flow of liquid therethrough, a flow control member comprising a cylindrical element forming a part of said frame and a movable element cooperating with the cylindrical wall of said first element to close said conduit to the flow of liquid therethrough, and a temperature responsive element comprising a member secured to said frame and acting against said movable flow control element to open the same, said temperature responsive element being mounted substantially coaxially of said conduit and exposed to the liquid in one end of the device."

"10. A flow control device for automobile engine circulating systems adapted to be interposed in said system between the engine and radiator, said device being adapted to be inserted in a conduit constituting a part of said system and said device being entirely self-contained and comprising a frame provided with an outwardly extending imperforate flange adapted for engagement in said conduit, said frame being arranged substantially coaxially of said conduit in line with the flow of liquid therethrough, a flow control member comprising a fixed element forming a part of said frame and a movable element cooperating with said fixed element to close said conduit to the flow of liquid therethrough, and a temperature responsive element comprising a member secured to said frame and acting against said movable flow control element to open the same, said temperature responsive element being substantially cylindrical and being mounted substantially concentrically within said conduit and exposed to the liquid in one end of the device."

The master decided that these claims are valid only if strictly limited to the construction shown by the drawings of the patent, namely, to the sleeve-type valve. As so construed, he held that the patent was not infringed.

The claimed advantages of the Palm patent are that it provides (1) equal adaptability for hose line or motor block installation; (2) ease of installation by the automobile manufacturer; (3) general adaptability to different automobiles; (4) removability (by the user) of the insert, leaving the conduit for the essential operation of cooling; (5) compactness, light weight and low cost, and (6) insurance of free flow, whatever the form of installation.

Appellant's device, as illustrated by the drawings and in the specific words of Claim 9, is directed to the use of a sliding-sleeve type of valve in which the valve seat is in the form of a cylinder and the valve, also in the form of a cylinder, slides therein. Each cylinder has openings which, when they register or coincide with each other, permit flow. When the openings do not register, flow is cut off.

If the holding limiting the scope of the Palm patent is correct, the master rightly found that there was no infringement, for appellee's device employs the double-clack valve, which consists of two flaps instead of the cylindrical members described in Palm.

We think that the master was correct in his conclusions as to validity. The prior art and the file-wrapper history limit the Palm patent to the specific disclosures of the specifications and drawings. The drawings plainly present a sleeve-type valve. If the patent, as claimed by appellant, covers every type of valve or thermostatic unit, then it is invalid as anticipated by the prior art.

The thermostat is old, and every valve in suit, as applied to the internal combustion engine, is old in the art. The Pierce-Arrow device, offered in evidence and in use more than two years prior to the Palm filing date, anticipates the claims, if they are construed as appellant contends. Appellant admits that, like the Palm device, the Pierce-Arrow is a flow-control device for automobile engine circulation systems adapted to be interposed between the engine and the radiator. It has an imperforate flange by which it may be inserted in position, and is adapted to be placed in the conduit, and like appellant's device, is a unit in itself. It consists of a poppet valve actuated by a bellows thermostatic element, and is disposed coaxially of the unit, and in line with the flow of the liquid. Appellant contends that the Pierce-Arrow device does not meet the patent because the flange forms part of the conduit itself, and contends that in the Palm patent

the conduit is a part of the claim. This argument is scarcely consistent with the statement to the Patent Office by the patent attorney for Palm that "The applicant has devised a self-contained unit which may be bodily inserted in a conduit and has no relation to any part of the conduit except at the point of engagement between the extending flange which also seals the conduit against flow and the wall of the conduit. * * *" The Pierce-Arrow device squarely meets the claims in suit if they are broadly construed, and they are invalid for anticipation unless they are limited to a sleeve valve.

The field was crowded. The Palm patent was applied for in 1923, and since 1915 the Fulton Company of Knoxville, Tennessee, had been exploring this particular branch of the art, making drawings of thermostatic appliances for internal combustion engines and actually shipping models which display the main features of Palm, if as broadly construed as appellant urges. These drawings were unpublished, and they do not in and of themselves constitute evidence of anticipation. But as the record shows, these drawings were of devices shipped in commerce, several of which were actually installed. This evidence has genuine probative value, for it shows a long-continued and far from casual exploration of this entire field, and furnishes evidence of the prior art. Among others, the record shows drawings of devices shipped to the Stevens Motor Branch of the Moline Plow Company, to the Grant Motor Company, to the Dort Motor Car Company, and to the White Motor Company more than two years prior to the Palm filing date, displaying the general features of the Palm device adaptable to use either in the motor block or in the hose line connection.

It is also significant that in the long history of the case in the Patent Office, the claims in issue having been filed as amendment five and a half years after the original filing, the device was limited by appellant's attorneys to the specific form disclosed by the specifications and drawings, that is, the sleeve-valve.

As originally filed, the claims stressed the feature that the bellows was mounted on the low pressure side. After the claims were rejected on French Patent, No. 508,-945, Claims 1 and 2 were amended by describing the valve as a sleeve-valve. Appellant's attorney said that the new amend-

ments covered "the valve construction by which the present advantages are obtained," thus referring to the sleeve.

■■ With reference to Claims 9 and 10, added by amendment, it was represented to the Patent Office that "Two new claims are being added above, it being noted that these have been directed to the specific structural details of applicant's device, and it is submitted that they clearly and patentably distinguish from the prior art." The "specific structural details" evidently refer to the sleeve-type valve, and appellant is entitled to no broader construction. These statements of appellant's attorney shed light upon the proper construction of the patent. As the specifications and claims are in applicant's words, what he said in making his application is of importance in construing the patent. Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 227, 26 L.Ed. 149; Grever v. U. S. Hoffman Co., 6 Cir., 202 F. 923, 927; Tee Pee Rubber Co., Inc. v. I. T. S. Rubber Co., 6 Cir., 268 F. 250. "While Patent Office arguments do not create estoppel, they often aid in apprehending disparity between claims presented and those granted." Firestone Tire & Rubber Co. v. United States Rubber Co., 6 Cir., 79 F.2d 948, 955.

We conclude that the Palm patent is limited to the sleeve-valve, and so limited, is valid. Since appellee employs the double-clack valve, no infringement exists.

The Zimmerman Patent, 1,590,146.

This patent is applicable to pump-cooling systems, and has for its thermostatic element a bellows. Claims 1, 2 and 7 are in issue.

Apart from the general purpose of simplification, the principal object of the Zimmerman patent is "the provision of a thermostatically controlled valve which operates to control the flow of the circulatory medium and is provided with means for causing an opening of the valve upon failure of the thermostatic element and by reason of the pressure exerted upon the valve by the circulatory medium."

The problem with which Zimmerman concerned himself was that which arises in case of leaks, ruptures or failures in the bellows. While the control of the circulation through a thermostat is advantageous, if the thermostat fails to operate, an excessive increase in temperature will result, and the engine is damaged by overheating. If a thermostat which provides a valve to shut off circulation fails to operate, leaving the valve closed, then circulation is completely prevented and the situation is far worse than if no thermostat had ever been installed.

Zimmerman claims to have accomplished his object by providing a device in which the area of the valve is larger than the effective area of the bellows so that the current caused by the pump will push open the valve when the leak in the bellows tends to nullify the partial vacuum therein, which in normal operation holds the valve shut. The required area of the valve will depend upon the pressure of the current created by the pump.

Appellant has manufactured and sold under the Palm and Zimmerman patents over two million devices up to 1933.

The master found that Claims 1 and 2 were invalid because of lack of novelty, and that Claim 7 only covered Zimmerman's precise construction. He decided, however, that Claim 7 must be confined to the construction disclosed, and that as so limited, it was not infringed.

Claims 1 and 2 are almost identical. Claim 1 is typical, and reads as follows:

"1. In combination a circulatory conduit, a valve disposed therein to control flow therethrough, said valve opening downstream therein, and a sealed hollow resilient element disposed on the upstream side of said valve and connected thereto, said element containing a volatile fluid at subnormal pressure, said element expanding to open said valve, and said element then exerting a closing pressure upon said valve consisting of the subnormal confined pressure plus any tension in the element, and the area of said valve being greater than effective area of said element, whereby a puncturing of said element allows the pressure of circulatory liquid to overcome the resistance of said valve to opening."

Claim 7 reads as follows:

"7. In apparatus of the character described, the combination of a circulatory conduit, a transverse partition disposed in said conduit and having an opening therethrough, a valve disposed on the downstream side of said partition, a hollow imperforate, cylindrical, expansible and contractible thermostatic element disposed on the upstream side of said partition, said element having its upstream end fixed against movement, means connecting said element and said valve whereby contrac-

890

tion of said element causes said valve to seat against said partition and close said opening and expansion of said element opens said valve, and the area of such opening in said partition being materially greater than the effective area of said element, whereby pressure of liquid in said conduit tends to open said valve upon failure of the expansible element."

We question whether the comparison of the area of the bellows with that of the valve adds marked utility to the combination. The relationship which actually effects the opening of the valve port is that between the water pressure and the valve. If the pressure is low, a larger valve area will be necessary to effect the opening. If the pressure is high, even a small valve will open readily.

We think that all three claims are invalid for anticipation. All of the claims include a conduit for water circulation, a valve, and a thermostatic element of a lesser area than the valve. In addition to these features, Claim 7 requires that the area of the opening in the partition, that is in the valve port, be materially greater than the effective area of the thermostat, whereby the water pressure in the conduit tends to open the valve upon failure of the bellows. The latter clause expresses the gist of Zimmerman's claimed invention. But the precise construction described in these claims was not new. The record exhibits various instances of invention and use of devices so close to Zimmerman in structure and function that they anticipate. The Pierce-Arrow device, which was in public use in March, 1921, exhibits a valve of greater effective area than the bellows. The Studebaker devices, in public use in 1920, anticipate the Zimmerman construction in this respect. The record presents numerous drawings of devices shipped by the Fulton Company in 1920 to the White Motor Company, to the Scripps-Booth Motor Company, and to the Holt Manufacturing Company, all of which, used before the filing date of Zimmerman, disclose a valve of greater effective area than the thermostat. While to superficial inspection the areas appear the same on certain of the drawings, it is conceded that the effective area of the bellows is from two to six per cent less than the area computed from the mean diameter.

Also the Northway motor device made in appellant's plant in 1920, and the thermostats made for Ford and Overland in 1920, are clear anticipations. It is true that Zimmerman first stated this problem and claimed whatever function results in any way from having the area of the valve exceed that of the bellows. But a function is not patentable. Cf. Burr v. Duryee, 1 Wall. 531, 570, 17 L.Ed. 650. The earlier inventors were entitled to the benefit of any novelty which is an inherent function of the mechanism devised. Pickett v. F. B. Stearns Co., 6 Cir., 10 F.2d 414, 416; Detroit Stoker Co. v. Brownell Co., 6 Cir., 89 F.2d 422. That the appellee's device opens under pump pressure is evidence to the effect that the device achieves the same results as Zimmerman, but all that he disclosed was old, and produced an old result. The claims are invalid for want of novelty.

The Levy Patent, 1,763,802.

This patent discloses an automobile thermostat which employs the butterfly valve with leverage interposed between the valve and the thermostatic element. As stated in the specifications, in prior thermostatically controlled devices the motive effort imparted to the valves had been gradually applied and was often of subordinate effect compared to the resulting fluid pressure changes effected by slight movement of the valve from or to closed position. Levy claimed to eliminate this deficiency by the provision of a thermo-responsive element capable of communicating a powerful motive effort to the valve, the resulting motion being capable of multiplication whereby the valve might be moved sufficiently to quickly close a relatively large valve port without the possibility of having the action materially altered by the varying pressure of fluids adapted to pass through the valve. The main result of the claimed invention is said to reside in the fact that the thermo-responsive actuating element merely by a relatively short snap movement is capable of communicating powerful multiplied motion to a valve to effect positive opening and closing of a valve port. This snap action is attainable only by use of the bi-metallic disc. The advantages of durability, simplicity of construction and economy of manufacture are also claimed to reside in this device.

The claims in suit are 8, 10 and 12. They read as follows:

"8. A thermostatic mechanism comprising a tubular conduit element adapted to be secured to a liquid containing casing to control flow therefrom through a port thereof, a valve pivotally mounted trans-

versely within said conduit element and supported thereby, movable to obstruct or effect the ready flow of fluid from the casing through the conduit, a skeleton supporting means carried by an end of said conduit, adapted to support said thermostat element in substantially axial alignment with the conduit passage, and spaced longitudinally of the conduit element from the pivotal axis of said valve, and an arm extending longitudinally of the conduit element from said thermostat element to said valve to communicate movement of said thermostat element to the valve to operate it, means connecting the end portion of said arm to said valve, said connection means comprising a crank arm extending from the intermediate portion of the valve, and means for making a cranking connection between said crank arm and said motion communicating arm end."

"10. A unitary thermostatic mechanism adapted to be removably insertable in a water line to variably control the flow of water inversely commensurably with the temperature thereof, comprising a tubular casing, a butterfly valve pivoted in the casing, a thermostat supported by the casing spaced longitudinally thereof from said valve, and disposed in substantially longitudinal alignment with the axis of the casing and having its exterior surface entirely freely exposed to the water located entirely at one side of said valve, means connecting said thermostat to said valve at a point closely adjacent its axis near the longitudinal axis of the casing, and means for removably securing said unitary mechanism to a water conduit."

"12. A thermostatic mechanism removably insertable as a unit in a water line, comprising a tube, a butterfly valve pivoted therein to rotate on an axis extending transversely thereof, a thermostat supported thereby substantially in alignment with the longitudinal axis of the tube, a link for communicating motion from said thermostat to said valve, interconnecting a movable portion of the thermostat and said valve joined to the valve closely adjacent its axis of rotation, said thermostat disposed entirely at one side of said valve."

■ The master found the claims invalid for want of invention. This conclusion is correct. The bi-metallic disc and the butterfly valve alike were old. Appellant admits that "The selection of the swinging type of valve made the introduction of a considerable leverage a matter of simple

construction." The butterfly valve with the link and crank connection described in the claims is shown in numerous prior devices. It appears in the Fulton devices, made before 1920. Also several of the Fulton constructions had a valve disposed at an angle, as is shown in the Levy patent. The Fulton devices heretofore listed in the discussion of the Palm patent, sent by the Fulton Company to the Moline Plow Company, the Dort Motor Car Company, the Grant Motor Company, the Bethlehem Motor Corporation, and to the Saxon Motor Company, disclose the features of Levy. The same structure is shown in the following patents:

| | | |
|---|---|---|
| Lammert, | 1,118,500, | November 24, 1914 |
| Fulton, | 1,220,972, | March 27, 1917 |
| Purdy, | 1,521,475, | December 30, 1925 |
| Purdy, | 1,528,786, | March 10, 1925 |
| Rayfield, | 1,528,788, | March 10, 1925 |

Appellant urges that Claim 8 presents particular elements in addition to those of 10 and 12. As we read it, Claim 8 simply adds the supporting means to the features described in Claims 10 and 12, and discloses no element of novelty.

Since the patent is not valid, it is not necessary to discuss infringement.

The Levy Patent, 1,822,863.

■ Claim 2 of this patent is in issue. It reads as follows:

"2. In a valve device for controlling the flow of fluid in a conduit, a main frame, a stationary valve element mounted in the frame and having a tubular passage way through which the fluid may flow, a movable valve element mounted for operation on an axis to open and close the passage way, a longitudinally collapsible thermostatic element mounted in the frame, and comprising a collapsible chamber and a head therefor, the chamber being exhausted to a predetermined degree of vacuum and containing a heat expansible medium, the chamber being adapted to have impressed thereupon the temperature of the fluid and the head being adapted to have impressed thereupon the pressure of the fluid, a connecting element between the head and the valve element and having a pivotal connection with the valve element, the said passage way being formed to have a longitudinal axis of symmetry and the oscillatory axis of the movable valve element being positioned at one side of said axis of symmetry."

The principal feature of this patent is that the valve is set pivotally in the conduit with its pivotal axis offset. But this fea-

ture is also shown in Lammert, 1,118,500, and Jorgensen, 1,745,622, filed February 27, 1926. Lammert speaks in the specifications of a butterfly valve "preferably fulcrumed eccentrically as shown," and in Claim 2 he includes as one of the elements "a butterfly valve pivotally supported to one side of its median line in the discharge end of the casing."

Since this is the gist of the claimed invention, it is evident that the device presents no patentable novelty.

The decree is affirmed.