## FORD MOTOR CO. v. K. W. IGNITION CO.

(Circuit Court of Appeals, Seventh Circuit.   October 4, 1921.)

### No. 2879.

1. Patents ⬦222, 261—Owner held estopped by acquiescence in manufacture of patented article by defendant.

The inventor of an ignition coil for automobiles explained his invention to the engineers of defendant, a large manufacturer of cars, who assisted him in perfecting the same, and later defendant adopted such coil as a part of its standard equipment and built and equipped at large expense a department for their manufacture in part to supply its needs, the inventor assisting in selecting and installing the machinery. Afterward he obtained a patent for the invention and assigned the same to complainant. which in the years following supplied defendant with coils to the number of 5,000,000, besides large numbers of parts for use in its own manufacture, of which complainant had full knowledge, from which arrangement complainant derived large profits. Defendant during such time had no actual knowledge of the patent, and coils made by complainant were not marked as required by Rev. St. § 4900 (Comp. St. § 9446). *Held*, that complainant, by its conduct and affirmative acts, was estopped to assert infringement or to challenge defendant's right to manufacture such coils in the future, and was precluded by failure to mark its product from recovering damages for infringement by defendant.

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Costs ⊂∞238(1)—Denied to successful appellant, filing reply brief more elaborate than original brief.**

Where appellant's reply brief of 250 pages covered the same subjects as the original brief, but far more elaborately, thereby necessitating further briefs by appellee and answering briefs by appellant, costs of appeal will be denied appellant, though decree is reversed.

Appeal from the District Court of the United States for the District of · Indiana.

Suit in equity by the K. W. Ignition Company against the Ford Motor Company. Decree for complainant, and defendant appeals. Reversed.

Edward Rector and W. Clyde Jones, both of Chicago, Ill., Otto F. Barthel and H. C. Underwood, both of Detroit, Mich., and Arthur M. Hood and George B. Schley, both of Indianapolis, Ind., for appellant.

Edward G. Hoffman, of Ft. Wayne, Ind., and Mosely Arthur Keller, of New York City, for appellee.

Before BAKER, EVANS, and PAGE, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Appellee brought this suit against appellant for damages for past infringement, and to enjoin future infringement of patent No. 1,092,417, covering an ignition apparatus, which patent was issued to James A. Williams and by him assigned to appellee. From a decree sustaining the patent, directing an accounting, and restraining further infringement, appellant appeals. Numerous defenses, including invalidity, estoppel, laches, and non-infringement in the state of Indiana, where the suit was begun and tried, are set forth.

[1] It will not be necessary to consider any defenses other than estoppel.

Upon this issue the facts are singularly free from dispute. Many of them are established by letters. Where there is any serious dispute, we have resolved it in favor of the appellee. So analyzed and examined, the record shows:

The appellant to be an extensive manufacturer of automobiles, who during the period of alleged infringement (1914–1919) turned out 3,-000,000 cars equipped with 12,000,000 ignition coils of the type under consideration. About 5,000,000 of these coils were supplied by appellee and the remainder manufactured by appellant, and for their alleged wrongful production damage is sought. In addition a large number of parts or entire coils were made by both parties to supply the retail trade or Ford users.

The Williams coil, it is alleged, tended "to eliminate any lack of synchronism or timing in the operation of several cylinders." It displaced, or tended to displace, an apparatus known as the master vibrator in the production of which Williams was interested and which he manufactured. Appellant did not equip its cars with this master vibrator. It was while Williams was negotiating for advertising space in a trade paper published by appellant that he first spoke of a new coil for which he claimed better results in the respect above mentioned. As a result of this conversation he later met appellant's engineers, and tests were made of his coil. Appellant's engineers and Williams there-

atter made numerous changes in the construction and arrangements of parts in this coil. While Williams denies that the changes were vital or essential to produce greater synchronism, it is apparent that they were productive of economy in construction, in simplification of the parts, and were largely persuasive in inducing appellant to adopt the coil as a part of its standard equipment.

Prior to this time appellant purchased its coils from different manufacturers, using three different types, the Heinze, the Kingston, and the J & B coils. It manufactured none. These various coils were produced by different manufacturers. Neither Williams nor appellee had any of appellant's coil business.

In order to avoid confusion resulting from the use of different types of coils and to cheapen the cost of production and lessen the cost of the stock in trade which the retailer was required to carry, appellant decided to standardize its coil. It considered various makes. In the main they were similar in appearance and in the general method of operation they were alike. It would serve no useful purpose to set forth their differences.

After examining the various types or models then on the market, appellant selected the Williams coil and thereafter all of its cars were equipped therewith. It was understood at the time of the adoption of this coil as a part of its standard equipment that appellant should, on acount of its extensive business, have two sources of supply. To avoid the delays and damage resulting from fires, strikes, etc., appellant insists on two sources of supply for all of its standard equipment. It was therefore understood and agreed that appellant should install a department for the manufacture of these coils. It was equipped by appellant, but Williams assisted in the selection and arrangement of machinery. Thereafter the enormous demand for these coils was supplied by both parties.

Appellee at all times knew appellant was manufacturing the coils in large numbers. Mr. Williams was frequently in appellant's coil manufacturing department where from three to four hundred employees were at work and knew that large sums of money had been expended in building and equipping this department. The parties exchanged parts used in manufacturing the completed coils and appellee frequently sold large quantities of parts to appellant to be used in manufacturing its coils. We quote a few of the many letters establishing these facts.

The quotations are all taken from letters written by appellee's manager to appellant or some officer thereof. On January 7, 1919 it wrote:

"Confirming our telephone conversation with you this morning, we are expressing you today 100,000 T-6772, 5/16ths inch hexagon nuts 12–32 thread. * * * Investigation shows that you are using a punched nut on this job. As we prefer a machine nut and are using same, please do not replace this shipment to us, and we will make arrangements to replenish our own stock."

On another date:

"We are pleased to acknowledge your valued order #77604, covering 5,000,-000 T-6799 Tungsten point rivets."

A year earlier this letter was written:

"We have your valued order #75354, covering 500,000 part T-6799 Tungsten point rivets, was duly received by us and the December shipment made you on December 14th. Shipments will be made at the rate of 100,000 per month from now on as requested."

Again:

"In answer to your letter of August 13th, the instructions we received were not in the form of a communication, but were verbal instructions given to the writer while in your coil department."

The following is most significant:

"Regarding yours of the 14th, in reference to our securing wood backs and bottoms from the Michigan Truck & Lumber Co. We note that you are at this time taking their entire output and, therefore, cannot allow them to ship us 5,000 sets as requested. If you will please advise us your other source of supply on these, we will take it up with them and see if we can possibly secure these parts from them. The tractor plant is after us for delivery on metal boxes and we are handicapped at this time on account of wood backs and bottoms. If there is any possible way that you can help us out without interfering with yourselves, we would appreciate the same very much."

The purchase of 5,000,000 Tungsten point rivets alone was notice to appellee that appellant was manufacturing the units on a large scale. The letters indicate not only normal, but extreme, cordiality, where one manufacturer accommodated the other by loaning parts which were replaced.

At no time was the subject of a patent mentioned.

Williams, however, after making his arrangement with appellant, sought and secured the patent in issue. He never marked any of his products with his patent number and in no way suggested that his coil or any part of it was covered by a patent. At no time prior to the commencement of a suit in which another corporation, Henry Ford & Son, Inc., an organization formed to manufacture and sell tractors, was indirectly interested, did appellant have actual knowledge of the issuance of this patent. It appeared in this suit that Henry Ford & Son, Inc., gave an order to the Kokomo Electric Company to make for it some coils. Appellee brought suit against this manufacturer to enjoin the infringement of the patent in suit, and then for the first time did appellant through its officers learn of the existence of the patent.

Upon these facts we have no hesitancy in denying appellee all right to recover damages for past infringement. Every element necessary to establish an estoppel is here disclosed. While silence on the part of one who should speak, yet remains mute, may be sufficient to support a defense of estoppel in certain instances, the facts in the record before us go much further. Appellee not only did not protest when it should have spoken, but by actions and by speech it sanctioned appellant's conduct in manufacturing its coils.

It is not hard to gather appellees' motive. It had none of appellant's enormous business in coils. If the so-called Williams coil could be made a part of appellant's standard equipment, its business from that source alone would be enormous and it would be established.

Even though appellant made a part of its own products, appellee's business would be satisfactory. And the results proved the wisdom of its course. Five million coils from 1914–1919, besides an enormous business in replacing parts for retailers and users, resulted.

But, whatever its motive may have been, appellee cannot induce another to act, deal extensively with such other party, sell it a large proportion of material and parts necessary to the production of the completed unit, and then secure damages for the manufacture of such article. Authorities in support of such a conclusion need hardly be cited. A few are herewith collected. 21 Corpus Juris, 1216; 10 Ruling Case Law, 694; 2 Herman on Estoppel, § 1060; Bigelow on Estoppel, 648; Gill v. U. S., 160 U. S. 426, 16 Sup. Ct. 322, 40 L. Ed. 480; Keyes v. Eureka Consolidated Mining Co., 158 U. S. 150, 15 Sup. Ct. 772, 39 L. Ed. 929; Lane & Bodley Co. v. Locke, 150 U. S. 193, 14 Sup. Ct. 78, 37 L. Ed. 1049; McClurg v. Kingsland, 42 U. S. (1 How.) 202, 11 L. Ed. 102. Passing by all question of Williams' right under the circumstances to secure a patent, conceding, for the sake of the argument, that the contribution of appellant's engineers was nil, that the changes made as a result of tests in appellant's experiment room in no way bear on the question, the fact remains that appellee consented to appellant's equipment of a department for the manufacture of these coils, consented to appellant's manufacture and sale of these coils, exchanged parts with it, and sold it a large proportion of the parts used in the manufacturing of the completed unit.

Section 4900, R. S. (or section 9446, U. S. Compiled Statutes Annotated, 1916), also stands squarely in the way of appellee's right to recover damages for past infringements. Concededly appellee failed to mark its patented article. It, therefore, must be denied all right to recover damages, unless it can prove that "defendant was duly notified of the infringement and continued after such notice to make, use or vend the articles so patented." The evidence fails to show any such notice.

That part of the decree which requires appellant to account for its profits from the manufacturing of these coils, therefore, cannot stand.

And for the same reasons and others we cannot escape the conclusion that appellee is estopped to challenge appellant's right to manufacture these coils in the future.

Even though the coil be not the joint product of the brains and experiments of Williams and appellant's engineers, the former could, as the inventor and the possessor of the right to exclude all others from manufacturing or using the monopoly, give appellant the right to manufacture and sell the coil. And this concession would result in no financial loss, if as a result of its grant appellant made the coil a par' of its standard equipment. The coil was of little commercial value unless the user of Ford cars adopted it. And its most extensive use was obtainable only through its adoption by appellant as a part of its standard equipment. If, to secure such a result, patentee was willing to concede to appellant the right to manufacture and sell these coils, it cannot now complain. Whatever its motive, it cannot encourage a user to expend hundreds of thousands of dollars in the erection of a

department for the manufacture of such coils, it cannot assist by advice and otherwise in the selection of machinery to be used in their manufacture, and later, when as a part of its standard equipment these coils are on millions of cars and their name and value is established through countless agencies and car users, halt the manufacturer's right to continue their production. Few cases can be found that call more loudly for the application of the doctrine of estoppel than the present one. And, while this court recognizes and now adheres to the ruling that a patentee may be denied damages for past infringement and yet be entitled to an injunction restraining future infringement, Rajah Auto Supply Co. v. Belvidere Screw and Machine Co. et al., 275 Fed. 761; Wolf v. U. S. Slicing Machine Co. (C. C. A.) 261 Fed. 195, we do not find in the instant case facts which would justify us in applying the rule of these cases.

[2] In the presentation of this appeal appellant submitted its brief in 127 pages. After appellee replied thereto, appellant submitted a reply brief of over 250 pages, covering the same subjects, but far more elaborately than in the original brief. This in turn called for the submission of a brief by appellee, which has been met by still further briefs. We cannot commend appellant's practice of partially presenting an argument in the main brief and reserving for the reply brief its real presentation. For its failure to comply with the rule appellant will be denied all costs in this court.

The decree is reversed, with directions to the District Court to dismiss complainant's bill.