## LUKENS STEEL CO. v. AMERICAN LOCO-MOTIVE CO.

Civ. 3596.

United States District Court
N. D. New York.

July 11, 1951.

Synnesvedt & Lechner, Philadelphia, Pa. (Raymond H. Synnesvedt and Alfred C. Aurich, Philadelphia, Pa., of counsel, Bartle Gorman, Utica, N. Y. Local Counsel), for plaintiff.

Kenyon & Kenyon, New York City (W. Houston Kenyon, Jr., Charles Dickerman Williams and J. Edward Shinn, all of New York City, of counsel, Miller, Hubbell & Evans, Utica, N. Y., by A. J. Monahan, Utica, N. Y. Local Counsel), for defendant.

BRENNAN, Chief Judge.

This is a patent infringement action. The validity of the patent in question is put in issue by the answer. That the plaintiff is estopped from asserting its claim of infringement was alleged both as an affirmative defense and as a counterclaim. The answer also contains a second counterclaim, which in substance alleges that the plaintiff holds its patent as a trustee for the benefit of the defendant and, therefore, should be enjoined from enforcing any rights thereunder as against the defendant, and that the patent in question should be assigned to it.

At a conference in the nature of a pretrial hearing it was agreed that the issues of

444

estoppel and those raised by the second counterclaim should be tried first, and that the Court decide same prior to the receipt of evidence upon the question of infringement. This procedure was adopted to minimize the expense and to save time, since, if the defendant were found to be right in its contentions, it would be unnecessary to litigate the question of infringement.

The plaintiff is a large manufacturer or fabricator of steel products, with its principal place of business at Coatesville, Pa. During the period in question here Lukenweld, Inc. was a wholly-owned subsidiary or division of the plaintiff, with its principal place of business also at Coatesville, Pa. Generally speaking, it is unnecessary to distinguish between the two corporations, and for the sake of convenience the term "Lukens" as used herein will refer to either or both corporations. The term "Lukenweld" will be used when desirable to refer to that company alone.

The defendant has been and is engaged in the manufacture of locomotives. Its principal place of business is at Schenectady, New York, and it owns and operates a division at Auburn, New York, which is referred to in the evidence as the "Auburn Branch". For convenience, the defendant will be referred to as "Alco" herein.

Prior to the occurrences pertinent to this litigation the parties had enjoyed a long-standing, pleasant business relationship. Some of the officers of each party were personally acquainted and their relationship may be termed as both business and social. In a business way Alco had purchased the products of Lukens in such an amount and over such a period of time as to warrant the application of the term "—good customer—" by the vendor.

The issues herein arise by reason of the use by Alco of a spline-type design in the manufacture of Diesel road locomotives. The design refers only to the portion of the locomotive which at times is referred to in the testimony as a frame and as a block or cylinder block. The Court is impressed that the use of the word "block" more nearly describes in untechnical terms the item involved in this litigation. Confusion may be avoided by an understanding that the terms "frame" and "block" are used interchangeable in the record. The spline member consists of a metal rod extending the full length of the engine block. It is the center element thereof and is actually the "backbone" or "core" upon and around which additional elements are added, which ultimately make up the completed apparatus.

A background of facts is necessary to determine the applicability of the doctrine of estoppel. The essentials will, therefore, be concisely stated. In the year 1943 and prior thereto by reason of competitive conditions it was essential that Alco be able to produce Diesel locomotives capable of road performance over lengthy passenger and freight hauls. Hence, it was necessary to produce road Diesel locomotives as distinguished from switching locomotives which had been in production for some time. The problem had been the subject of Alco engineering research and design; such activity being centered at the Auburn division where its engineers had substantially completed a design for the building of such a road locomotive. The problem was of such importance that a policy committee had been formed by Alco for the express purpose of speeding the production of the locomotive above referred to. A vice-president of Alco, in charge of engineering, a Mr. Davenport, was the person upon whom the principal burden of the problem rested. In April, 1943, before asking the policy committee for the final approval of the Alco design, he desired that his own confidence in the Alco engineering staff be fortified by an appraisal of the design of the block by a qualified, noninterested engineer. Upon his own initiative and upon the approval of the policy committee, he decided to obtain if possible the advice, help and criticism of a Mr. Chapman, who he understood was connected in some manner with the Lukens organization. He had at that time at least hearsay information as to Mr. Chapman's experience in the field of engine design and use of weldments in Diesel engine assembly.

Mr. Davenport contacted Mr. Wiese, an official of Lukens, with whom he was acquainted, and disclosed to him his desire to obtain the benefit of Mr. Chapman's ex-

perience and skill. Chapman, who had been president of Lukenweld, had resigned his office on April 24, 1943. His relations with the Lukens organization were and continued to be friendly. He was the owner of certain patents among which was No. 2,-078,056, which for this litigation is assumed to cover the spline-type block subsequently adopted by Alco. The assignment to or purchase of such patents by Lukens had been the subject of negotiations, but Chapman also was interested in the settlement of (a), his rights in the pension plan of Lukens, and (b), in the terms of an agreement whereby he would be retained as a consultant by Lukens. No doubt negotiations as to each of the three items were not completed at the same moment. Chapman considered them as separate items, making up a "whole package" which was "buttoned up" by written agreements between Chapman and Lukens on August 23, 1943. An assignment of the patent referred to herein was among such writings.

It is disputed as to whether or not Wiese advised Davenport as to the status of Chapman with Lukens, but it becomes unimportant because there is no dispute but that the substance of Davenport's inquiry was received by Mr. Wolcott, the president of Lukens, who thereby obtained knowledge that Alco was embarrassed by its failure up to that time to have an approved design for a road locomotive block. Some time elapsed and actual occurrences are not entirely clear, but on June 6, 1943, Davenport was requested by Wolcott in substance to delay contacting Chapman until Davenport and Wolcott could meet for a personal discussion on June 15. Such a meeting occurred; the details of which are not necessary here, except to state that Alco's problem re an engine block design was disclosed, and the help of Chapman solicited. It is apparent that a definite understanding was not reached, and on June 18 Davenport wrote Wolcott asking for a proposition whereby Alco could obtain the services of Chapman in designing an engine structure of the type referred to. Wolcott replied to the request in writing, advising in substance that Wolcott had talked with Chapman and a Mr. Charlton, an officer of

Lukens, and that "We will be very glad to undertake this proposition without cost to your good company." It was contemplated or suggested that Chapman would proceed on the following outline: (1), check Alco's present design; (2), prepare a new design; (3), explore the design then used on switch engines; (4), re-design frames of steam locomotives so as to use weldments. It was suggested that Charlton and Chapman meet with Alco's chief engineer at Auburn. The above proposition was approved by Davenport and it was explained that the question of the frames of steam locomotives was a matter handled at Schenectady, and would be taken up later.

Then followed the actual efforts of the executive and engineering personnel of both Lukens and Alco, with Chapman's help and guidance, to solve the problem. The Auburn branch was visited and inspected; the efforts of Alco's engineers were examined and appraised; blueprints thereof were placed in Luken's possession for study, and problems and methods of manufacture were observed and discussed. Lukens' Coatesville plant was visited and inspected. In short, there was a genuine, sincere effort to supply the engine design which was the objective of the parties, accompanied by a complete disclosure of mechanical or engineering theories, designs and accomplishments. On August 3, 1943, an engine design was submitted by Chapman, Charlton and Snyder, chief engineer for Lukens, to Alco's engineers at Auburn. This design is referred to as "spline type" design and apparently embodied the Chapman patent. Same was presented to Alco's policy committee and accepted by it on August 5, Lukens was notified the same day.

During the course of Chapman's work and about the middle of July, 1943, on an occasion when Davenport was visiting the Coatesville plant, Chapman pointed out or referred to the spline member and stated that he had a patent thereon. The matter was not further discussed, and neither Chapman nor Davenport appeared to attach any significance to the statement. The subject was never further discussed nor mentioned by anyone until 1948. Daven-

port did not relate the assertion to any Alco officer, and it is evident that he considered the statement as unimportant.

Chapman does testify that about July 8, 1943, at Davenport's office at New York City, he told Davenport of the existence of the patent, and that it had been or was about to be sold to Lukens. Davenport does not recollect such conversation, which in any event would add little, if anything, to the admitted statement regarding the patent referred to above.

Manufacture of the frames embodying the accepted design got under way slowly. In 1944, none were manufactured at Auburn, Alco's requirements were purchased from Lukens. In the subsequent years the manufacturing capacity of the Auburn branch was enlarged, and it is evident that only Alco's needs beyond its capacity to produce were purchased from Lukens. From 1944 to 1949, 507 frames were purchased from Lukens at a total cost of about $1,700,000. Component parts were also purchased at a total cost of about $390,000.

In April, 1948, for the first time a patent plate or marker was placed by Lukens upon a frame or frames supplied to Alco. This action indicated for the first time an intention by Lukens to avail itself of the remedy provided in 35 U.S.C.A. § 49, which in turn is dependent upon the duty imposed therein. Inquiry was made by Alco as to the facts, and finally in November, 1948 demand was made by Lukens for the payment of a royalty for the use of the patented element in all frames manufactured by Alco. Failure to adjust the matter was followed by this litigation.

The above outline contains the primary facts as found, which are not essentially disputed. With such factual background it is logical to pass to a discussion and determination of the nature of the relationship created by the parties, since the determination of that question is a necessary preliminary to the application of the law of estoppel.

Here, Lukens furnished the services of the expert Chapman and the skill of their engineering staff. Alco furnished a design in drawing form the result of the efforts of their engineering force arrived at over a period of time and at a considerable cost. It also furnished the continued skill and efforts of its engineers. Both Lukens and Alco therefore made substantial contributions, the actual evaluation of which is unnecessary and impossible. Subsequent events demonstrate that their efforts may be termed successful.

The motives of the parties are easily found. Alco desired an engine design capable of competitive manufacture and performance. Lukens envisaged, if the venture were successful, the cementing of a business relationship with a good customer, and the likelihood of an increased demand for Lukens' products by Alco. It is unnecessary to catalog the relationship with legal accuracy. "Life has relations not capable always of division into inflexible compartments. The moulds expand and shrink." Glanzer v. Shepard, 233 N.Y. 236, at page 241, 135 N.E. 275, at page 277, 23 A.L.R. 1425.

It certainly was not a vendor and purchaser arrangement to which the rule of *caveat emptor* applies. Neither was it the formal relationship which exists between fiduciary and beneficiary, guardian and ward, or principal and agent. It appears in some respects to have some of the elements of a joint venture, but it is sufficient to say that it was a business relationship involving mutual confidence and mutual effort in which each party hoped to profit. Alco's goal was a competitively profitable engine block design. Lukens' goal was the future sale of its products. Although this Court can find no enforceable contract whereby Alco agreed to make any definite purchases for any definite time, or under any particular condition, it is readily inferable that Alco expected and intended to purchase at least part of its requirements from Lukens.

The problem next confronting the Court is the determination and application of the law which governs the conduct of the parties in the relationship found above.

Each case depends upon its own facts but speaking generally it may be said that when one reposes confidence in the skill or integrity of another who purports to act for the first party's benefit, then the

actor may take no advantage to himself in hostility to the interest of the first party. A confidence reposed and accepted requires an undivided loyalty.

Authorities are hardly necessary to support the above rule, but the quotation from 1 Leading Cases in Equity 62 is recognized as authoritative, and has been quoted in Baker Oil Tools v. Burch, 10 Cir., 71 F.2d 31, at page 37; Shell Petroleum Corp. v. Pratt, D.C., 22 F.Supp. 304, at page 307; Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587; Trice v. Comstock, 8 Cir., 121 F. 620, at page 627, 61 L.R.A. 176. "Wherever one person is placed in such relation to another, by the act or consent of that other, or the act of a third person, or the law, that he becomes interested for him, or interested with him in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interest he has become associated." Baker Oil Tools v. Burch, supra.

Plaintiff's argument that the rule does not apply to the business relationship of these two large corporations experienced in business affairs is rejected. The fundamental concepts of honesty and fair dealing bind all business relationships in the various degrees required by the position of the parties and the extent of the confidence reposed. Theirs was not the "arms length" dealing referred to in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1. The finding that confidence was reposed in Lukens and that both parties were interested in perfecting a suitable engine design makes the rule directly applicable.

Neither is the argument that the arrangement whereby Lukens' assistance was accepted by Alco without consideration valid here. Subsequent events show that Lukens profited by the acceptance of the spline-type design. In any event it is apparent that Alco intended and was willing to pay for Lukens' services and Lukens may not lessen its obligation by offering and tendering its services "at no cost to your good company." Lukens may not accept, even gratuitously, an obligation embodying the confidence of Alco, and by its proposal induce Alco to accept the design tainted with its own hostile interest.

What is the measure of Lukens' obligation here? Concisely stated, it was obliged to make a full disclosure of any information it possessed which would adversely affect the full free use of the design presented to the Alco engineers at Auburn on August 3, 1943.

The most concise statement found by the Court which expresses the applicable rule is taken from Brennan v. National Equitable Investment Co., 247 N.Y. 486, at page 490, 160 N.E. 924, at page 925, as follows: "A duty to speak is imperative as matter of law where conduct, accompanied by silence, would be deceptive and beguiling." The principle has been applied in an unbroken line of cases beginning with Gregg v. Van Phul, 1 Wall. 274, 280, 68 U.S. 274, 17 L.Ed. 536. Reported cases express the rule in different language, but is applied where one who is afforded an opportunity to speak, claiming an interest in a title or estate, remains silent when another acts or is about to act to his injury. To cite additional authorities is to belabor a point of law which is actually not in dispute. The controversy here arises by reason of the contention that the facts do not warrant its application.

The elements necessary for the invocation of the rule are present here. The Lukens' representatives, who presented the design to Alco for acceptance, had knowledge of the patent. They were hopeful that the patent embodied in the design would be accepted as presented. They knew that Alco contemplated the manufacture of the block if the design were accepted. They must have known that the presentation of the design was intended to influence Alco's future operations. It must have been further apparent to them that failure to disclose the existence of the patent was likely to mislead Alco into the assumption that it might use the design without limitation.

Lukens' obligation to speak is plainly apparent by reason of the existing circumstances. At the time the design was pre-

sented and accepted, Lukens was either the equitable owner of the spline patent embodied in the design, or it was in the process of the purchase of same from Chapman. Lukens claims that all negotiations for the purchase of the patent were concluded in April, 1943 and that there remained only the formal signing of the assignment by Chapman to complete the transaction. Alco claimed that the purchase by Lukens of the patent was an inseparable part of the arrangement whereby Chapman's rights in the Lukens' pension plan and the terms of his agreement to act as consultant to Lukens were finally agreed upon. These items referred to by Chapman as a "whole package" were finally "buttoned up" on August 23, 1943. The Court is inclined to a finding in accordance with Alco's contention, but it would appear to be unnecessary to make such a finding, since it was obligatory on the part of Lukens to disclose to Alco either that it was the owner of a patent, or was negotiating for the purchase of a patent with which it could prohibit the use of the pro-offered design.

There is another circumstance which required a full disclosure on the part of Lukens. During the period of time that the design was in the formulative stage Lukens' engineers and officers visited the Auburn branch. Manufacturing equipment and procedure were observed, and it was undisputed that Lukens knew that it was contemplated that manufacturing operations would be carried on at that place. In the period following the acceptance of the design the facilities of the Auburn branch were expanded so that a greater proportion of Alco's needs could be manufactured there. The fact is that the increase of the Auburn facilities required a large expenditure on the part of Alco, and it is hardly credible to conclude that Lukens had no knowledge of such expansion in view of the relationship between the parties from 1943 to 1948. This statement is made in the light of the knowledge of Lukens of the purchases made by Alco of block components, the purchase of machinery, and the opportunity by Lukens to observe the conditions at Auburn. There remained then the continuing obligation upon the part of Lukens to make a full disclosure of the existence and ownership of the patent even after the acceptance of the design.

As previously stated, a part of Lukens' contribution consisted of the inclusion of the patented spline element in the completed design. Lukens' presentation of the design to Alco for its acceptance and use must, therefore, have carried with it the intention to make the grant effective, and to permit Alco to enjoy the full use thereof. This principle is recognized in U. S. v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408; Edison Electric Light Co. v. Peninsular Light, Power & Heat Co., 6 Cir., 101 F. 831. These authorities apply the rule in the case of the sale of a patented article. Here it is no doubt true that the design was not "sold" by Lukens to Alco in a technical sense, but the right to use the design was granted by Lukens without restriction, and the Court sees no reason why the principle does not apply.

The citing of the case of Ford Motor Co. v. K. W. Ignition Co., 7 Cir., 278 F. 373, would seem to be sufficient authority for the disposition of this controversy, except that in that case the existence of a patent was not mentioned. Here it is conceded that Davenport was advised of the existence of the spline patent and Lukens claims that such disclosure was sufficient notice to Alco so as to prevent the application of the rules referred to above.

It must be remembered that the disclosure as to the existence of the patent was made by Chapman and not by Lukens. Chapman's status with the Lukens' organization at that time is not clear. His relations with Lukens were friendly and he was rendering services to Lukens under some temporary arrangement which was superceded by the written consulting agreement of August 23, 1943. It is very evident that Davenport was not impressed by the importance of the disclosure. He treated the information as an item imparted in a casual manner with no indication of its importance to the subject of the design. No one knew at that time that the patented element would be actually incorporated in

the design as finally approved. There is no evidence that Chapman ever advised Lukens of the disclosure made to Davenport until about 1948 when Lukens prepared to exercise its veto power of further use of the design by Alco. Lukens is then placed in the position of urging that it has fulfilled its legal obligation by reason of the fortuitous act of a third person neither known to nor inspired by it. This is hardly the obligation of one in whom confidence is reposed.

It may be true that Alco was bound to investigate the patent situation even if its information were derived from an outside source, provided same was sufficient to put it upon notice. Davenport at the time was fortified with the knowledge that he was dealing with Lukens and not with Chapman and that he had the writing of Lukens' president to the effect that its efforts towards the perfection of a design would be without cost to Alco. Certainly it was not within his contemplation that a royalty for the use of the design would be demanded by Lukens. The Court has no hesitation in finding that the notice given by Chapman to Davenport was insufficient to relieve Lukens from the obligation to speak as to the existence and ownership of the patent.

It would appear from the statements made herein that defendant properly invokes the doctrine of estoppel. Some reported cases, such as Cook v. Ball, 7 Cir., 144 F.2d 423, at pages 437–438; Buss v. Prudential Ins. Co. of Am., 8 Cir., 126 F. 2d 960, at page 966; Nelson v. Chicago Mill & Lumber Co., 8 Cir., 76 F.2d 17, at page 21, 100 A.L.R. 87; U. S. v. S. F. Scott & Sons, 1 Cir., 69 F.2d 728; Clark v. Fisher, 2 Cir., 8 F.2d 588, set out the essential elements of the doctrine. Other cases, such as Fisher v. Bishop, 108 N.Y. 25, at page 29, 15 N.E. 331; Automatic Paper Machinery Co. v. Marcalus Mfg. Co., 3 Cir., 147 F.2d 608–613; Walker v. Lightfoot, 9 Cir., 124 F.2d 3, at page 6; Grand Trunk W. R. Co. v. H. W. Nelson & Co., 6 Cir., 116 F.2d 823, at page 836. See also Cook v. Ball, supra, 144 F.2d at page 439, seem to apply the doctrine in a rather broad manner to prevent inequity or deceit.

The Court here finds that the parties were engaged in a common project; that Lukens was either the owner of the spline patent or was negotiating for its purchase at the time the design was submitted to Alco; that Alco had no knowledge concerning the existence or ownership of the patent; that an opportunity was afforded Lukens to speak concerning the existence of the patent and its incorporation in the design, and did remain silent, knowing that Alco was relying upon Lukens' skill and advice and intended to make use of the design in the manufacture of the engine block; that Alco was mislead by Lukens' silence and will be damaged if the patent is enforced; that Lukens continued its silence relative to the patent from 1943 to 1948, during which period Alco had changed its position and expanded its manufacturing facilities.

The findings herein are sufficient to warrant the conclusions of law that the doctrine of estoppel is applicable here; that Lukens is estopped from interfering with or prohibiting the use by Alco of the engine block design referred to herein; that Alco be deemed to possess an irrevocable license to the use of said design; and that the complaint be dismissed.

As far as the counterclaim is concerned, defendant urges that Lukens be held to be a trustee of the spline patent for Alco's benefit, and that Lukens be required to transfer the patent to Alco on such terms as may be just. The evidence warrants the inference that the spline member was used by Lukens in other manufacturing operations. Alco's rights therein are limited to its use in the manufacture of Diesel road locomotives. The defendant is amply protected by the judgment directed herein, and the counterclaim is, therefore, dismissed.

If other, further, or additional findings or conclusions are desired, same may be submitted within ten days.

It is desired that the judgment be agreed upon as to form. If not agreed upon, same may be settled on two days' notice.