**HENRY J. KAISER CO., Vereinigte Oesterreichische Eisen Und Stahlwerke Aktiengesellschaft Oesterreichisch-Alpine Montangesellschaft and Brassert Oxygen Technik AG., Plaintiffs,**

v.

**McLOUTH STEEL CORPORATION, Defendant.**

**No. 16900.**

United States District Court
E. D. Michigan, S. D.
June 22, 1959.

George E. Brand, George E. Brand, Jr., Detroit, Mich., John A. Dienner and Edward C. Grelle, Chicago, Ill., for plaintiffs.

William B. Cudlip and T. Donald Wade, Dickinson, Wright, Davis, McKean & Cudlip, Detroit, Mich., John Vaughan Groner and Ronald F. Ball, Fish, Rich-

ardson & Neave, New York City, for defendant.

FREEMAN, District Judge.

Plaintiffs filed an action in this court alleging that on July 23, 1957, United States Letters Patent No. 2,800,631, hereinafter called the Suess patent, were issued to Theodor Eduard Suess, et al., and that, since the date of issuance of said Letters Patent, plaintiffs, by various licensing agreements, have had the exclusive, irrevocable right and license under said patent to sub-license others to use the processes contained therein for producing products and to sell such products. The complaint, as amended, further alleges that defendant has been and will continue infringing said patent unless enjoined by the court. Therefore, plaintiffs pray for injunctive and other relief.

Defendant's answer contains a counterclaim, Count II of which alleges that an agreement was entered into between plaintiff Kaiser and defendant McLouth Steel Corporation on November 19, 1954, to the effect that Kaiser, in consideration of $100,000, agreed to sell and did sell to defendant certain "know how," together with the right and license to use said "know how," including drawings, engineering and metallurgical or other written data or information relating to an "oxygen steel process;" that the "know how" purchased by McLouth from Kaiser included each and every substantial or material fact disclosed in the Suess patent; and that defendant, by reason of such purchase of "know how" from Kaiser, became entitled to a paid-up license under the Suess patent. In their answer to this count of the counterclaim, plaintiffs admit that the "know how" disclosed to McLouth disclosed the same or substantially the same subject matter disclosed in the Suess patent and included each and every substantial or material fact disclosed in the Suess patent.

Plaintiffs then filed a motion for summary judgment under Rule 54(b) and Rule 56(b) and (c) of the Federal Rules of Civil Procedure, 28 U.S.C.A. alleging that there is no genuine issue of fact

involved under Count Two of said counterclaim and that plaintiffs are entitled to such a judgment as to Count II as a matter of law and that defendant is not entitled to a paid-up or other license under the Suess patent.

Thereafter, defendant filed a cross-motion for summary judgment as to Count Two of its counterclaim wherein it is also alleged that there is no material issue of fact involved and defendant is entitled, as a matter of law, to a fully paid-up license covering the subject matter of the Suess patent.

Both parties agree that there is no issue of fact involved in the determination of these motions for summary judgment and that the legal effect of the agreement of November 19, 1954, is solely a question of law for the determination of the court.

The contract in question, consisting of Kaiser's proposal to McLouth dated October 8, 1954, which was accepted by defendant and became effective November 19, 1954, provided essentially for the sale of "know how" and the furnishing of certain services by Kaiser to McLouth in connection with that sale, together with the right to a license under any patents which from time to time in the future Kaiser might own or control or under which Kaiser may have the right to grant a license, relating to the oxygen steel process. Numbered Paragraphs 1 and 6 of the proposal are primarily involved in these motions and, insofar as pertinent, are as follows:

"1. HJKCo. or Construction Co., or either or both of them, will acquire and provide McLouth with the 'know how' which HJKCo. or BOT is entitled to acquire as set forth above and is continuing to acquire and develop in connection with such Oxygen Steel Process and facilities employing such process, including but not limited to drawings, engineering and metallurgical or other written data or information relating to such Oxygen Steel Process. In this connection HJKCo. or Construction Co., or either or both of

them, will provide reasonable consultation services and advice from time to time, as well as the general supervision of any additional services which McLouth may wish to obtain as outlined in paragraph 3 hereof, and at McLouth's request HJKCo. will arrange for a representative or representatives of McLouth to visit and to study the methods and practices in use at plants now or hereafter operated by any of the parties described in paragraph A–4 of the above-mentioned Option Agreement utilizing such process. \* \* \* The services mentioned in this paragraph will be available for the fixed fee mentioned below.

"6. In the event HJKCo. shall own or control or have the right to license others under any patent containing a claim or claims covering apparatus or processes used by McLouth in its practice or use of the Oxygen Steel Process, it will grant to McLouth, at its election as provided below, a non-exclusive right and license to practice or use the subject matter of such claim or claims. HJKCo. shall notify McLouth in writing from time to time of all such patents and McLouth shall be entitled to the continued practice or use of the subject matter of any claim or claims of such patent for a period of six months after receipt of such notice without payment of royalties or without incurring any other obligation to HJKCo.

\* \* \* \* \*

"In the event of McLouth's failure to notify HJKCo. in writing of its acceptance of a license under the terms hereinabove set forth within a period of six months after receipt of notice from HJKCo. of any such patent, the right of McLouth to a license thereunder in accordance with the terms hereof shall forthwith terminate and the provisions of this paragraph shall no longer be applicable to such patent and the

rights and liabilities of the parties with respect to such patent shall be determined as though this agreement had never been made. Failure to accept a license under any one or more such patents shall be without prejudice to McLouth's right to a license under any other such patent."

Defendant contends that, since the disclosure of facts by Kaiser in performance of its contract to furnish "know how" admittedly resulted in a disclosure of the entire subject matter of the Suess patent, it, therefore, now has a paid-up license to use that subject matter without payment of royalties or exercise of its option rights under Paragraph 6 of the agreement. Defendant bases its contention on two legal theories: (1) that it has a paid-up license as a result of an implied license derived from the contract to sell "know how" and (2) that Kaiser is estopped to assert its license against defendant because of its sale of the disclosures of the claims in the Suess patent under the "know how" agreement. In support of such contention, defendant argues that plaintiffs, having contracted to sell "know how" and having disclosed the claims of the Suess patent in performance of this contract, cannot now derogate from its grant and enforce its patent rights.

Plaintiffs contend that Paragraph 6 of the agreement expressly provides for the contingencies that have occurred and resulted in this suit, and that Paragraph 6 evidences an intention of the parties that, if Kaiser should obtain a right to license others under any patent "containing a claim or claims covering apparatus or processes used by McLouth in its practice or use of the oxygen steel process \* \* \*," McLouth will have an option to accept a license under that patent, subject to a royalty payment of twenty-five cents per ton of steel produced. Thus, plaintiffs argue, there is an express provision in this contract for granting licenses under after-acquired patents and this provision negates defendant's contention that it has purchased the sub-

ject matter of the Suess patent as an incident of the disclosures of "know how" and, therefore, is entitled to an implied license.

■ It is quite true, as defendant argues, that there is a body of law holding that "a grant necessarily carries with it that without which the thing granted cannot be enjoyed." Edison Electric Light Co. v. Peninsular Light, Power & Heat Co., 6 Cir., 1900, 101 F. 831, 836; Cold Metal Process Co. v. Republic Steel Corp., D.C.N.D.Ohio, 123 F.Supp. 525, affirmed 233 F.2d 828, certiorari denied 1955, 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed. 2d 86; United Printing Machinery Co. v. Cross Paper Feeder Co., D.C.Mass. 1915, 220 F. 322. It is also true that the cases hold that "where the owner of a patent grants to a licensee the right to use a patented machine, the grant carries with it, by necessary implication, a license under any other patent of the licensor which would be infringed by operation under the grant." Frederick B. Stevens, Inc. v. Steel & Tubes, 6 Cir., 1940, 114 F.2d 815, at pages 819–820. However, an application of these broad principles to the facts of this case, as contended for by defendant, presents grave difficulties.

■ It is a cardinal principle of construction of contracts that "all parts of the writing, and every word in it, will, if possible, be given effect." 17 C.J.S. Contracts § 297, p. 711; Sawyer v. City of San Diego, 138 Cal.App.2d 652, 292 P.2d 233; Associated Truck Lines v. Baer, 346 Mich. 106, 77 N.W.2d 384.

■ It is also well established that "no word in a contract is to be rejected or treated as a redundancy, or as meaningless, if any meaning which is reasonable and consistent with the other parts can be given to it." 17 C.J.S. Contracts § 308, p. 725. Stated in somewhat different terms, "every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole

instrument." 6 R.C.L. 838, quoted in McIntosh v. Groomes, 227 Mich. 215, 218, 198 N.W. 954, 955.

The agreement provides for the sale of "know how" to defendant by Kaiser. At no place in the contract is there a precise definition of "know how." However, there is language that indicates that the parties intended to exclude any grant of a license under a patent from the meaning of the phrase "know how" as used in this agreement. The first paragraph of Kaiser's Proposal No. P11B–54 is indicative of this intent. It provides:

"Henry J. Kaiser Company * * * has heretofore submitted to McLouth Steel Corporation * * * proposals for the furnishing ▸of 'know how', consulting and other services in connection with the Oxygen Steel Process as hereinafter defined, together with the right to a license under any patents which from time to time in the future HJKCo. may own or control or under which HJKCo. may have the right to grant a license."

The above paragraph does not evidence any intent of the parties to equate the meaning of "know how" and the term "license," but appears to indicate that the parties contemplated that these terms had different connotations in their use. Further evidence of this conclusion can be found in the third unnumbered paragraph of the Proposal, supra. In this paragraph, the following language is found:

"HJKCo. has represented to McLouth that BOT by contract has received the right as agent or otherwise to grant licenses under any U. S. Letters Patent now or hereafter owned or controlled by the parties referred to in paragraph A–4 of the aforementioned Option Agreement between BOT and HJKCo. and to acquire from them and disclose 'know how' connected with or useful in the practice of the Oxygen Steel Process, and HJKCo. further represented to McLouth that it has re-

ceived from BOT the right to grant rights or licenses under said patents and 'know how' relating to such Oxygen Steel Process, and HJKCo. further has represented that it has the right fully to inform McLouth as to all of these and to grant McLouth the right and license to use the same as well as the right and license to use such patents or 'know how' developed or otherwise acquired by HJKCo. relating to such Oxygen Steel Process. * * * "

Here again the use of the terms "know how" and "license" indicates different meanings, since the agreement states that Kaiser has represented that BOT has received the right to grant licenses *and* to disclose "know how *connected with* or *useful in*" the oxygen steel process. This usage indicates that "know how" is something other than the "licenses" to which reference is made, since a patent license would be permission to use the process itself and the "know how" is merely knowledge useful in or connected with, even incidental to, the process. This differential in meaning is again evidenced in the fourth unnumbered paragraph of the Proposal. Thus, throughout the preliminary matter in the Proposal prior to the numbered paragraphs setting forth the terms of the contract the parties have used these two terms in a context indicative of dissimilar meanings. In the body of the Proposal this usage is continued.

In Paragraph No. 1, Kaiser contracts for the sale of "know how," while a licensing option agreement is found in Paragraph No. 6. There, in five detailed subparagraphs, the parties provide for the license option referred to, supra, and there is no reference to "know how."

It should also be noted that in Paragraph No. 2 the contract provides that McLouth shall pay Kaiser $100,000 not only for "know how," but "for the 'know how' and services described in Paragraph 1 *and* for the right to receive a license as hereinafter provided in paragraph 6 * * *."

The above provisions of the contract indicate that the parties did not intend to grant a license by a sale of "know how," since the agreement clearly indicates that the terms "license" and "know how" are intended to have different meanings. Defendant's argument that it purchased a right to use the subject matter of the patent when it purchased "know how" would be more persuasive if the parties had not separately provided for a license option in Paragraph 6 and had not used these two terms in such a manner as to evidence an intent that their meanings were mutually exclusive. In the absence of these factors, the authorities, supra, cited by defendant in support of its contentions, could govern the outcome of this case.

However, the court is convinced that the construction of the contract contended for by defendant would render Paragraph 6 a virtual nullity and would constitute a deviation from the use of the terms "know how" and "license under a patent" as used throughout the agreement. Paragraph 6 provides in detail that defendant shall have an option to accept a license under any patent under which plaintiffs shall have a right to license others, pertinent to the oxygen steel process. If the court holds that this contract bars an action for infringement of the claims of any patent which were disclosed as "know how," there would be no necessity for such an option provision. In other words, the court would be holding that Kaiser granted a license when it sold "know how." This the agreement does not purport to do. The context of the agreement negates any intent to grant any license under Paragraph 1 and provides in some detail for granting a license in Paragraph 6. The more reasonable construction is that the parties intended a separate sale of "know how" and a separate sale of a right to a license, provided Kaiser obtained a right to grant licenses under a valid patent in the future. The fact that the agreement grants "know how" in a separate paragraph and treats licenses and "know how" as being differ-

ent from each other throughout the agreement negates any intent to grant a license as to any of the information disclosed as "know how."

Defendant cites one case in support of its position that is the closest authority to the facts of this case found by counsel or the court. In Lukens Steel Co. v. American Locomotive Co., D.C.N.D.N.Y. 1951, 99 F.Supp. 442, affirmed, 2 Cir., 1952, 197 F.2d 939, the trial court considered a case involving a patent infringement action based on a patent relating to the design of a locomotive. American Locomotive had approached Lukens Steel asking for its assistance in the design of a locomotive. Lukens had furnished a consulting engineer who did aid in the design of the locomotive and while so doing disclosed the contents of a patent that was subsequently granted and assigned to Lukens. Lukens then sued for patent infringement. The court there held that the plaintiff had furnished assistance to the defendant in developing this locomotive, had stood idly by and allowed the defendant to produce the engine, knowing that the claims of the patent would be infringed, without informing defendant of the possible infringement, and then had attempted to enforce the patent. This, the court held, the plaintiff could not do. The court held that in assisting in the design the plaintiff had in effect granted to defendant its rights in the design used and it could not derogate from the terms of that grant. McLouth here contends that this case governs the outcome of the case at bar. It is true that the Lukens Steel case is close to this case on the facts, but it is readily distinguishable. In the Lukens case, there was no written contract and there was no provision for any licenses to be granted after the design was furnished to American Locomotive. In fact, the trial court said, 99 F.Supp. at page 448:

"Here it is no doubt true that the design was not 'sold' by Lukens to Alco in a technical sense, but the right to use the design was granted by Lukens *without restriction,* and

the Court sees no reason why the principle does not apply." [Emphasis supplied]

In the case at bar, the contract does contain a restriction since it makes provision for the grant of a license, should Kaiser come into possession of any patent right relating to the oxygen steel process. Proposal No. P11B–54 provides in the fourth paragraph at pp. 1 and 2 of that Proposal, "McLouth may obtain the 'know how', consulting and other services in connection with such oxygen steel process and the right to a license under any patents which from time to time in the future HJKCo. may own or control or under which HJKCo. may have a right to grant a license." In other words, the contract is not merely a sale of "know how," as McLouth contends, but rather it is a contract for the sale of "know how" *and* the sale of a right to a license under any patent which Kaiser may own or control. Therefore, it clearly appears that Kaiser sold "know how" with restrictions designed to protect its rights under any patents it might control in the future. Under such circumstances, it cannot be said that Kaiser now derogates from its grant or is estopped to assert a patent right even though the claims of that patent may have been disclosed in performance of its obligations to furnish "know how."

Paragraph 7 of this contract gives further convincing weight to the construction placed on this agreement by the court. That paragraph provides, in part:

"7. In the event of the issuance of a United States Patent relating to such Oxygen Steel Process to any of the parties referred to in paragraph A–4 of the Option Agreement hereinabove mentioned, *including specifically any U. S. Patent issuing on Suess Application Serial No. 206147,* referred to in paragraph A–10 thereof, *but under which HJKCo.* for *any reason is unable to grant the rights provided in paragraph 6* and in event McLouth is charged with infringement of any patent issuing

to such parties referred to in such paragraph A–4 or on such Suess Application, * * * HJKCo. undertakes to save McLouth harmless therefrom without cost or expense * * *." [Emphasis supplied]

It appears uncontroverted that Suess Patent 2,800,631 issued on an application which was a continuation in part of Suess Application Serial No. 206147, specifically referred to in Paragraph 7 of the proposal. The context of the above quotation clearly indicates an intent of the parties that the license provisions of Paragraph 6 should apply to Suess Application 206147. If such treatment is to be afforded to that application by mutual agreement, even though defendants may not have known the contents of that application, as they say they did not, then it would certainly appear that the parties intended the provisions of Paragraph 6 to apply on the issuance of other patents of a similar nature and especially to a patent that is a continuation-in-part of Suess Application 206147. Therefore, the provisions of Paragraph 7 lead the court to the conclusion that plaintiffs' contentions represent the more reasonable construction of this agreement.

There is still another reason to hold that this agreement does not contain an implied license as to matters disclosed as "know how." In Paragraph 6, it is provided that, if McLouth fails to exercise its option on a proffered license within six months of receipt of notice from Kaiser, McLouth's rights to a license will terminate and the " * * * rights of the parties with respect to such patent shall be determined as though the agreement had never been made."

Plaintiffs contend that this provision amounts to a royalty free six months' license after McLouth is notified of the existence of a patent by Kaiser. Plaintiffs then cite authority indicating that a license for the life of a patent cannot be implied where there is an express license for a shorter period. Cf. Hazen Mfg. Co. v. Wareham, 6 Cir., 242 F. 642, 647, where the court said:

" * * * The subject-matter of the contract was Wareham's invention, and both parties undertook to promote its sale; and to this end Wareham in effect licensed the company to manufacture and sell the invented baler for a limited period only and subject to a royalty and sales commission reserved to himself. Manifestly there could be no implied license in the presence of this instrument; an express license and an implied license cannot in the nature of things coexist. * * * 'No implied contract of license, arising from the circumstances under which the patent was taken out and the relations of the parties, can be set up in the face of proved special contract of license.'"

It is true that some of the incidents of a traditional patent license are missing from the relationship established during the six months' period; however, it appears that McLouth has six months within which to opt for a license and during which it may continue an infringing use of a valid patent claim with impunity. This permissible use certainly seems to be the essential characteristic of a patent license. Therefore, it does appear that the ultimate effect of this paragraph is to grant an express license for the six months' period. Thus, the authority cited by plaintiffs is pertinent and applicable and defendant's contention that there is an implied license arising from the disclosure of the claims of the Suess patent must fail.

For these reasons, the court is of the opinion that plaintiffs' motion for summary judgment should be granted and defendant's motion for summary judgment should be denied. An appropriate order may be presented.